# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER KNOX,          )
                           )
          Plaintiff,       )
                           )    **2:12-cv-539**
          v.               )
                           )
FIFTH THIRD BANCORP,       )
                           )
          Defendant.       )

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is a MOTION FOR SUMMARY JUDGMENT (ECF No. 34) filed by Defendant Fifth Third Bancorp ("Fifth Third" or "Defendant") with brief in support (ECF No. 35). Plaintiff Christopher Knox ("Plaintiff" or "Knox") filed a brief in opposition (ECF No. 42); Defendant filed a reply brief (ECF No. 47). The summary judgment record has been fully developed with Defendant's concise statement of material facts (ECF No. 36), Plaintiff's counterstatement of material facts (ECF No. 43), and the response thereto (ECF No. 45), and the parties' appendices (ECF Nos. 37, 44, 48).

Fifth Third has filed a MOTION TO STRIKE (ECF No. 46) Exhibit 6 to Knox's Appendix, an unsigned affidavit of Knox, as inadmissible or otherwise untimely should he supplement the record with a signed copy. Knox filed a Supplemental Appendix (ECF No. 48) in which he includes a signed affidavit but does not address its untimeliness.

As a preliminary matter, the Court will deny the motion to strike and substitute the signed affidavit in place of the original. Although Fifth Third is correct in asserting that the Court should generally not consider an unsworn statement in deciding a motion for summary judgment, it may substitute a properly executed affidavit for a deficient one prior to making its ruling. *See Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1306 (S.D. Fla. 2010).

# I.    Background

## A.  Factual Background

The following background is taken from the Court's independent review of the motion for summary judgment, the filings in support and opposition thereto, and the record as a whole.

### 1.  Knox's Hiring and Promotion

Firth Third hired Knox in October 2005 as Vice President, Divisional Manager of Wholesale Lending at the age of forty-nine.  Prior to his hire, Knox worked at Lehman Brothers where he was reportedly unhappy with his job, which led him to reach out to his friend and colleague Bob Lewis to inquire about the availability of a position at Fifth Third.  Lewis and Knox previously worked together at Wells Fargo, where Knox reported to Lewis for nine years. Throughout that time, Lewis never experienced any problems with Knox and considered him a friend who he would socialize with outside of work.  Lewis is approximately four years older than Knox.

Soon after Knox's inquiry, Lewis offered Knox a job with Fifth Third.  Knox once again reported directly to Lewis who was the National Wholesale Manager at that time.[1]  Knox's compensation consisted of a base salary, incentives and bonus potential.  Moreover, Knox signed an Incentive Compensation Plan in which he agreed to a modified limitations period for any action or suit related to his employment.  *See* Pl.'s Dep., Ex. 12 at 15, ECF No. 37-9 at 26-27.

Knox was initially tasked with visiting Fifth Third's affiliate banks to investigate their wholesale lending practices.  After his investigations were complete, Knox recommended to Lewis that responsibility for the wholesale lending function be taken away from the affiliates and

---

1.  There are three lending "channels" in the mortgage lending business: (1) the retail channel in which the bank takes applications directly from borrowers; (2) the wholesale channel in which the bank purchases loans from mortgage brokers, mortgage bankers, and others that are selling loans but not interested in servicing the loans; and (3) the correspondent channel in which the bank purchases loans from larger and more sophisticated lenders.

centralized in Cincinnati, Ohio under Lewis, who agreed with the proposal. Following the centralization, Knox was given responsibility for the northern region and two other divisional managers were hired. Knox proceeded to hire regional managers who reported directly to him and recruited their account executives.

At some point the following year, Lewis was promoted to President of Fifth Third' Mortgage and decided to elevate Knox to National Sales Manager for Wholesale Lending. Lewis and Knox both understood that this new role was a promotion, and Knox continued to report directly to Lewis. Along with Knox's promotion came more money and broader responsibility: six regional mangers now reported directly to him and each regional manager employed between ten (10) to fifteen (15) account executives. Knox was fifty-years-old at the time of his promotion.

### 2. Knox's Reassignment

Around September 2009, Knox was notified by Lewis that his position was going to be eliminated at the end of the year. Lewis explained that Dave Overcast, the then-Chief Operating Officer of Fifth Third's mortgage company who is approximately three years older than Knox, would be assuming Knox's responsibilities.[2] During that same conversation, Lewis further informed Knox that Fifth Third planned to look at some other opportunities for him that may exist. Knox was ultimately reassigned to another position in which he was tasked with

---

2. Knox testified that Overcast was employed as the Chief Financial Officer of Fifth Third's Mortgage Company at that time, but Defendant submits that he is mistaken. In turn, Plaintiff contends that he "is without knowledge sufficient to form a belief as to the truth or falsity of the averments contained in Paragraph 27 [of Defendant's Concise Statement of Material Fact]; therefore, the same are denied and strict proof thereof is demanded at the time of trial." (ECF No. 43 at 1). This response does not create a material dispute of fact, nor does the handful of other instances in which Knox offers the same response *See Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) ("[Plaintiff] must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or such vague statements."); *Houghton v. American Guar. Life Ins. Co.*, 692 F.2d 289, 295 (3d Cir. 1982) ("A mere demand for proof does not create a material issue of fact requiring the denial of a motion for summary judgment."); *see also* LCvR 56(E) ("Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.").

developing and leading a new correspondent lending channel for Fifth Third.

As Lewis testified, his decision to reassign Knox was based in part on his dissatisfaction with a few areas of Knox's 2009 performance as reflected in his evaluation that year.[3] Lewis chose this new position for Knox based on his perceived areas of strength. Knox never attempted to discuss the issue of reassignment with Lewis at any point because he was "mad" and "upset" over the manner in which he was supposedly treated. *Compare* Pl.'s Dep. at 67:25-68:1-2, ECF No. 37-3 at 9-10 ("Q. And why were you upset? A. I don't think I was treated properly. I think I was discriminated against.") *with id.* at 97:1-10, ECF No. 37-5 at 3 ("Q. And did you feel that decision was discriminatory based on your age? A. No, not at that point. Q. Do you now? A. Yes.").

### 3. Promotions Within Fifth Third After Knox's Reassignment

After Knox's national wholesale lending position was eliminated in 2009, three (perhaps) younger and (allegedly) less-qualified individuals were promoted. Those individuals were Mike Lane, Marty Garrity, and Jeff Smith. Lane became the direct report of Lewis as Director of Mortgage Administration in January 2011. Lane was forty-one-years-old at the time. Garrity was promoted by Lewis to the position of Retail Channel Manger in January 2010. Garrity was approximately forty-six-years-old at the time. Smith was promoted to Affiliate Head of Mortgage Banking. The record is not clear as to Smith's age.

Knox never inquired into the specific positions to which Lane, Garrity, and Smith were promoted nor applied for any open position while at Fifth Third. Instead, Knox indicated to Mark Wilson, a Human Relations representative, that he was interested in any open position which would have been a good match for his qualifications and skill set. *See* Pl.'s Dep. at 69:9-

---

3. Lewis rated Knox's 2007 and 2008 performance as a "Category 4 – above expectations." In 2009, Lewis rated Knox a "Category 3 – meets expectations." *See* Pl.'s Counter Statement of Facts, ECF No. 43 at 12-14.

25-70:1-2, ECF No. 44-1 at 19-20.

### 4. Knox's Work in the Correspondent Lending Chanel

Knox assumed his new responsibilities in early 2010 and reported directly to Overcast.[4] As part of his vision to build the correspondent lending business, Knox created a PowerPoint presentation for Overcast in which he recommended that Fifth Third needed certain products and polices in order to be competitive in the industry. These suggestions included lowering the lender net worth requirement, delegating underwriting authority, offering mandatory pricing, creating additional operational support, and having the ability to offer FHA loans. After reviewing the presentation, Overcast increased the net worth proposal and made some minor stylistic changes. Knox repeatedly requested that Overcast allow him to present the recommendations to Lewis and his manager Steve Alanzo, but they instead chose Overcast to represent the correspondent channel at an upcoming meeting regarding the proposals. Knox was dissatisfied with the selection of Overcast who he considered "not qualified." *See* Pl.'s Dep. at 74:1-18, ECF No. 44-1 at 21; *id.* at 79:3-30, ECF No. 44-1 at 22. Overcast presented the recommendations around February or March 2010 and reported the results to Knox: Fifth Third would not agree at that time to the lower net worth requirement, "put on hold for later development" the other suggestions until after the correspondent lending business was better established, and "approved in theory" his suggestion for increased operational capacity.

Knox disagreed with the approach adopted by Fifth Third, repeatedly voicing his opinion to Overcast that he could not be successful based on the decisions made by the bank. Likewise, Knox opined to his subordinates that the correspondent channel could not be successful without the approval of his proposed policies which Fifth Third was unwilling to implement. From

---

4. In addition to his salary, Knox received a monthly guaranteed minimum incentive compensation payment while the correspondent channel was developed. These payments continued longer than originally anticipated after Fifth Third experienced some delays in getting the correspondent lending channel operational.

Knox's perspective, he was never given the tools necessary throughout his entire tenure to get the correspondent lending channel "up and running."

Beginning in late 2010, Fifth Third was apparently not satisfied with Knox's job performance. As Overcast recalls, Knox was "struggling" in meeting certain expectations with regard to the number of people that he had hired, the total lenders that he had signed up to participate, and the volume of business that the channel had done over the past months. Knox recalls somewhat differently, namely that no goals were set for him in 2010.

Early the next year, Overcast sent an e-mail to Knox outlining various goals for Knox's team to meet in the first quarter of 2011. For example, in the January 4, 2011 e-mail, Overcast explained to Knox that the 2011 revenue goal for the correspondent lending channel was $700 million or approximately $60 million per month—less than the $2 billion annual revenue that Knox had once forecasted for the correspondent lending channel. The January e-mail further specified numerous monthly goals for Knox to meet: "(1) January—Submit and have approved 8 new lenders. Identify 4 to 6 W/S AEs to work with lenders and brokers. February—Submit and have approved 12 new lenders. Hire 1 new Correspondent AE. March—Submit and have approved 12 new lenders. Hire 1 new Correspondent AE." Pl.'s Dep. at Ex. 1, ECF No. 37-9 at 6. The January e-mail also informed Knox that the guaranteed minimum monthly incentive compensation payments, which had been extended for several months, would end at the end of March 2011. Knox agreed to the plan and goals memorialized in Overcast's e-mail. *See id.*, ECF No. 37-9 at 6 (reproducing an e-mail chain that includes the following exchange—Overcast: "Chris, I want to make sure that this is what we agreed to and these will be our GOALS. Do you agree?" Knox: "Yes, I have divided this up and provided each SE with their own goals. So it is now part of the record."); *see also* Dep. of David Overcast at 52:6-24, ECF No. 44-5 at 52.

### 5.  Knox's Performance Improvement Plan

Knox did not satisfy the goals that Overcast had established for him in January.  On February 18, 2011, Overcast sent Knox a performance improvement plan ("PIP") in which he noted that the February/March goals would too not be reached "unless something changes now." Pl.'s Dep. at Ex. 4, ECF No. 37-9 at 7.

In the PIP, Overcast reiterated the goals set forth in the January 2011 e-mail and counseled that Knox should "[not] focus on what you do not have but deliver on what you do have in place." *Id*.  The plan further advised that "[w]e can continue to work on initiatives that will enhance our business but those initiatives are additive to the plan and were not considered to be necessary to achieve our 2011 plan." *Id.*

On February 18, 2011, Knox sent a letter to Teresa Tanner, Executive Vice President and Chief Human Resource Officer for Fifth Third, in which he raised many concerns about his employment and the direction of the bank.  *See, e.g.*, Pl.'s Dep. at Ex. 5, ECF No. 37-9 at 9-10. ("As of today, I was asked to sign a [PIP], with goals which must be accomplished in 41 days. This is insulting to me, and shows a lack of any loyalty or integrity, especially considering the fact that I have helped create one of the best success stories in the mortgage banking industry, with the great success of the Fifth Third wholesale channel from 2006-2009.").  Knox also expressed his disappointment that he was put on a PIP rather than being offered another position within Fifth Third and requested that Tanner "facilitate a severance agreement." *See id.* at Ex. 5, ECF No. 37-9 at 10 ("Out of respect for what I have contributed to Fifth Third in my tenure, I ask you to facilitate a severance agreement for me, provided for by Fifth Third policy.  If I would have been treated with the appropriate amount of respect, integrity and dignity, this action would have been taken when my original position was eliminated.").

Overcast and Knox spoke about the PIP around mid-February. During their conversation, Knox sought Overcast's advice on how best to complete the itemized goals. Overcast apparently responded with "[t]he normal corporate speak, that we have tough standards, etc." Pl.'s Dep. at 112:3-19, ECF No. 44-1 at 30. Knox responded to the PIP by cancelling interviews he had scheduled in North Carolina, considering it unethical to hire anyone when he believed that he may be terminated in thirty or sixty days if he did not meet his goals.

Nancy Pinckney, Director of Employee Relations for Fifth Third, contacted Knox on February 21, 2011 to discuss his concerns. During their telephone call, Pinckney advised Knox that she had a copy of his letter and that she understood his dilemma. Pinckney informed Knox that it would take some time "to circle the wagons" with the other individuals involved and to prepare a response to his letter.

After her conversation with Knox, Pinckney met with Overcast, Megan Ruehl, (an Employee Relations Consultant), and Mark Wilson (an HR Business Partner), to learn about the underlying facts and business reasons for Knox's January 2010 reassignment. In addition, Pinckney made several attempts to contact Knox for further discussion, but she was not successful. Knox sent an e-mail to Pinckney and Wilson on February 25, 2011 in which he thanked them for their calls and indicated that he preferred drafting a letter "to discuss the PIP, [his] concerns about it, the day to day situation in the Correspondent Division and [his] suggestions for resolving all of these matters for your consideration." Pl.'s Dep. at Ex. 6, ECF No. 37-9 at 11. *See id.* ("I think it best, since two different conversations may occur, that we begin from a common source as to minimize any potential misunderstanding and differing interpretations."). At the conclusion of his correspondence, Knox indicated that the letter would arrive by the end of the following week.

### 6. Knox's Allegations of Age Discrimination

Knox sent his letter to Pinckney and Wilson on March 4, 2011 in which he raised allegations of age discrimination for the first time. *See* Pl.'s Dep. at Ex. 7, ECF No. 37-9 at 12-14. As Knox wrote:

> Since my position as national manager of the Wholesale Channel was eliminated, I believe that I have been placed in a position designed for failure. I believe that an attempt has been made to manage me out of Fifth Third Bancorp, as part of an ongoing elimination of older employees in the section. A comparison of the roster year to year from 2009 to 2011 will show that elimination of the older employees. That purge has now reached me – virtually the last employee in my age bracket still working from the original management team. Do I believe there has been and is age discrimination at work? Looking at the personnel changes, you'd have to say yes. I started to bring these issues to you in my first letter by outlining my reaction to the PIP, and asked for time to develop them further.

*Id.* at 12. Knox later comparison of the roster years 2009-2011 focuses on changes to Lewis' reporting structure and the ages of his direct reports.[5] At the time Knox's position was eliminated in 2009, Lewis had seven direct reports: Knox (age 53), Overcast (age 56), Ed Hensley (age 55), William Schumer (age 53), Julie Graham (age 53), Geoff Hill (age 35) and Steve Johnson (age 38). Graham was supposedly replaced by Glenn Brunker (age 45) sometime in 2009; Hill was allegedly promoted to replace Jim Tew ("in his 60's at the time") who "left 'voluntarily to pursue other interests.'" By the time Knox's employment ended in March 2011, Lewis had five direct reports. Overcast (age 58), Steve Johnson (age 40), Lane (Age 39), Garrity (age 45), and Steve Yaninek (age 41).

Nevertheless, in his letter, Knox also indicated that he was no longer interested in another position within Fifth Third and reiterated his request for a severance package commensurate with his title of Vice President and his eliminated position as a National Sales Manager of the

---

5. Knox cites to some puzzling outlets as the source for much of his information: the Nashville Morning Call (a business journal), Zabasearch.com (the self-entitled "Free People Search Engine"), and LinkedIn (the self-proclaimed "World's Largest Professional Network").

Wholesale Channel. *See* Pl.'s Dep. at Ex. 7, ECF No. 37-9 at 14 ("I am requesting that I be provided a severance agreement that is commensurate with my title as Vice President, and my eliminated position as National Sales manager of the Wholesale Channel . . . Please consider my proposal, and let me know if you have any questions."). Knox attributes his change in position over a fairly short time frame to the fact that "things were happening very quickly," such as the "exchange of letters and phone calls" and the so-called "threats" from Overcast when asked whether he was still "engaged" in his job.[6] *See id.* ("In my prior letter, I inquired as to the possibility of moving to another area of the Bancorp . . . I now see this as ill advised [*sic*] under the circumstances, because of the actions already taken to manage me out of the Bancorp.").

### 7. Knox's Separation Agreement, Termination & Replacement

Fifth Third sent Knox a separation agreement on March 11, 2011, which he received the following day. In its correspondence, Fifth Third notified Knox that his position as National Sales Manager – Correspondent Lending would end on March 18, 2011 but that he would remain on the payroll through April 22, 2011. Fifth Third offered Knox additional consideration in exchange for the separation agreement. *See* Pl.'s Dep. at Ex. 9, ECF No. 37-9 at 16-18.

Knox never signed the Severance Agreement because he did not consider it a fair offer. Among those components with which Knox took issue, he found the compensation offer

---

6. At Knox's deposition, the following exchange occurred:

> Q. Do you recall after that indicating that you weren't interested in another position with the company? A. That's correct, after a time period that – that count came off my table, if you want to look at it that way. Q. Well, it was in a fairly short time frame, wasn't it? I mean, that was during your – the communications that you had with Nancy Pinckney, wasn't it. A. Yes, things were happening very quickly. Q. Well, what things? A. Exchange of letters, exchange of phone calls, you know, threats that I wasn't doing my job from Dave Overcast. Q. You talking about when he asked you if you were engaged. A. It was more than being engaged. Q. Well, tell me exactly what conversations you're talking about. A. In addition to asking me if I was engaged, he wanted to know if I was doing my job, if I'm still working for the company, why was I not telling him the things I was telling ER.

Pl.'s Dep. at 132:23-25, ECF No. 37-7 at 3-4.

insufficient and sought to recover "enough to recognize the contributions [he] made to the bottom line revenue of the company, the fact that [he] built the business and [his] title within the organization."  Pl.'s Dep. at 140:14-25-141:1-4, ECF No. 44-1 at 37.

On March 16, 2011, Knox sent Pinckney a letter through counsel.  The correspondence states, in relevant part, as follows:

> You are hereby notified that Mr. Knox in no way wishes to resign his employment or to otherwise voluntarily terminate his employment with your firm. You should not construe anything said by my client to suggest that my client is unwilling to continue his employment.
>
> Specifically, Mr. Knox never intended under any circumstances to indicate that he was unwilling or unable to continue to service as valuable employee of your firm . . . Mr. Knox told you that the performance improvement plan which was developed by his immediate supervisors was unfair and unreasonable and could not realistically be performed by employee.  If you misunderstood Mr. Knox to say that he could not do the job, then you completely misunderstood the reasons for his remarks and the reason that he sought your assistance in the first instance. Mr. Knox came to you because he felt that he was being treated unfairly. You have now turned that into a claim that Mr. Knox had somehow intended to resign his employment.  This is a distortion of the facts as Mr. Knox presented them to you.

App. to Pl.'s Br. in Opp'n, Ex. 15 at 1-2, ECF No. 44-15 at 1-2.  *C.f.* Pl.'s Dep. at 159:1-7, ECF No. 44-1 at 42 ("Q.  Can we agree – you know, we've covered this, based on your recollection, but now that you've looked at the letter, can you confirm that at least as of March 4th that the only option that you were proposing to the bank was a severance agreement, correct?  A.  Yes."). It is unclear whether Knox ever received a response.

Knox's active employment with Fifth Third ended on March 18, 2011, and he received compensation for roughly two weeks following his separation which allowed certain benefits to vest.   After Knox's employment ended, he learned that variations of some of his recommendations were implemented at Fifth Third.  First, the $3 million net worth requirement of the correspondent program was dropped almost immediately to $500,000 as compared to

Knox's original proposal of $1 million and more recent proposal of $250,000. Second, Fifth Third added delegated underwriting four months later. Knox was replaced by James Costa who was fifty-years-old at the time of his hire and turned fifty-one-years-old shortly thereafter.[7]

### B. Procedural History

Knox filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on March 21, 2011, which he cross-filed with the Pennsylvania Human Relations Committee ("PHRC"). Knox received his Dismissal and Notice of Rights letter from the EEOC on January 31, 2012. This lawsuit followed.

Knox instituted this action on April 23, 2012 by filing a three-count Complaint in which he alleges discrimination under the Age Discrimination in Employment Act ("ADEA"), unlawful retaliation in violation of various federal employment statutes, and parallel state law claims pursuant to the Pennsylvania Human Relations Act ("PHRA").

At the close of discovery, Fifth Third filed a motion for summary judgment which Knox opposes in part. That is, Knox abandons his claim(s) for retaliation in his brief. *See* Pl.'s Br. in Opp'n, ECF No. 42 at 20 n.6 ("The Plaintiff offers no argument with respect to the claim that he cannot make out a case of retaliation. The Plaintiff is hereby withdrawing that claim."). Thus, only his claim of age discrimination under the ADEA and the PHRA remain.

The motion is now ripe for disposition. For the reasons that follow, the Court will grant the motion and enter judgment in favor of Fifth Third.

## II.     Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

---

7. Overcast retired from Fifth Third in September 2011, and he was replaced by Tom Booth. Once again citing to LinkedIn, Knox contends that Booth is eight years his junior.

R. CIV. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-248. *See Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," FED. R. CIV. P. 56(c) (1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage. *Anderson*, 477 U.S. at 255. Those functions are for the jury, not the court. *Id.* The court is thus limited to deciding whether there are any disputed issues and, if so, whether they are both genuine and material. *Id.*

### III.    Discussion

Knox asserts an age discrimination claim under both the ADEA and PHRA. In *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005) the Court of Appeals for the Third Circuit has determined that PHRA claims are to be analyzed according to the same standard as ADEA claims, therefore the following analysis applies to both of Plaintiff's claims.

Those claims focus on two separate employment actions: his 2010 reassignment and his 2011 termination. The Court will address both aspects seriatim.

### A.  Reassignment

Fifth Third argues that any claims relating to Knox's January 2010 reassignment are time-barred under the modified limitations period set forth in the Incentive Compensation Plan and based upon the administrative requirements applicable to federal and state employment discrimination actions. Alternatively, Fifth Third highlights that Plaintiff fails to meet the fourth element of his prima facie case.

In response, Knox submits that the contractual language is ambiguous and that the continuing violation theory applies to his reassignment. Knox also attempts to refute Fifth Third's position regarding his ability to make a prima facie case of age discrimination. The Court is not persuaded.

### 1. Incentive Compensation Plan Modified Limitations Period

Section IX of the Incentive Compensation Plan, entitled "Employment Claims," states as follows:

> Employee agrees not to commence any action or suit related to Employee's employment by Fifth Third:
>
> 1. More than six months after the termination of Employee's employment, if the action or suit is related to the termination of Employee's employment, or
>
> 2. More than six months after the event or occurrence on which [his] claim is based, if the action or suit is based on an event or occurrence other than the termination of [his] employment."
>
> Employee agrees to waive any statute of limitations that is contrary to this Section.

Pl.'s Dep., Ex. 12 at 15, ECF No. 37-9 at 26-27. Fifth Third and Knox further agreed to a choice of law clause with the "internal laws of the State of Ohio" to govern.

Contractual limitations period have generally been upheld and enforced in the Sixth Circuit and under Ohio law. *See Ellison v. DaimlerChrysler Corp.*, 3:06 CV 899, 2007 WL 3171758, at *5 (N.D. Ohio Oct. 30, 2007) (citing *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 355, 360 (6th Cir.2004)); *Williamson v. W. & S. Life Ins. Co.*, CT2007-0064, 2008 WL 4726498 (Ohio Ct. App. Oct. 28, 2008); *but c.f. Lewis v. Harper Hosp.*, 241 F. Supp. 2d 769, 772 (E.D. Mich. 2002) ("Were this Court to uphold the six month limitation of action clause as to Plaintiff's Title VII claim, the EEOC's period of exclusive jurisdiction would have the effect of abrogating Plaintiff's ability to bring a Title VII suit.").

Applying the modified limitations period, Knox was required to commence any action or suit against Fifth Third related to his January 2010 reassignment within six months. Knox waited until March 2011 to file his charge and April 2012 to commence this suit. Thus, any claim related to his reassignment is time-barred under the agreed-upon contractual language.

Knox attempts to escape the straightforward application of this clause by claiming that the phrase "commence any action" is ambiguous because it is undefined. This argument ignores well-settled contract law. *See Williamson*, 2008 WL 4726498, at *3 ("The mere absence of a definition of a term in a contract does not make the term ambiguous."). Nonetheless, Knox continues to highlight the "actions" he took after his reassignment: his March 2010 complaint to human resources; his February 2011 letter to Tanner; and his March 2011 EEOC charge. This argument also fails. *See Hogan Transports, Inc. v. Hills Dep't Stores*, 99AP-53, 1999 WL 1124664 (Ohio Ct. App. Dec. 9, 1999) ("[E]ven if 'action' alone is ambiguous, when it is used in conjunction with 'commenced,' the phrase conveys a single meaning: the initiation of a legal action."). Finally, Knox does not allege that he did not understand the phrase.

## 2. Federal and State Filing Requirements

Assuming *arguendo* that the contractual limitations period is invalid, Knox's claims are still time-barred based on his failure to timely file a charge of discrimination. As our court of appeals has explained, an action brought under the ADEA "will be dismissed for failure to exhaust administrative remedies if a supporting EEOC charge was not filed within 180 or 300 days (depending on state law) of notification to the employee of the adverse employment action." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 382 (3d Cir. 2007).

Knox did not file an EEOC charge until March 2011—more than eighteen months after he was notified that Fifth Third was eliminating his position and fourteen months after it became

effective. Thus, absent an applicable saving doctrine, his EEOC charge cross-filed with the PHRC was untimely insofar as it relates to his reassignment.

To that end, Knox attempts to revive his claim by invoking the equitable tolling doctrine, arguing that the reassignment was part of an ongoing plan to get rid of him and constituted a continuing violation. *See Ruehl*, 500 F.3d at 384 ("The ADEA's timely exhaustion requirement is a non-jurisdictional prerequisite that, like a statute of limitations, is subject to equitable tolling.") (citing *Commc'ns Workers of Am. v. N.J. Dept. of Pers.*, 282 F.3d 213, 216-17 (3d Cir. 2002)). But Knox's reassignment claim is not susceptible to this theory. *See Genevie v. Jackson*, CIV.A. 05-1733, 2008 WL 793885, at *8 (W.D. Pa. Mar. 24, 2008) ("The continuing violation doctrine does not apply when a plaintiff is aware of the injury at the time it occurs."); *see also Anderson v. Mercer Cnty. Sheriff's Dep't*, CIV.A. 11-07620 JAP, 2013 WL 776237, at *8 (D.N.J. Feb. 28, 2013) ("Plaintiff's claims cannot be saved under the continuing violation theory, however, because an employer's reassignment is quintessentially a discrete employment action.") (citation omitted). Accordingly, Knox failed to timely exhaust his administrative remedies for his reassignment claim.

### 3. Prima Facie Case

Even if the continuing violation theory applied in this case, Knox still cannot establish a prima facie case of age discrimination as to his reassignment. Under the ADEA, it is "unlawful for an employer to . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" when the individual is at least forty (40) years old. 29 U.S.C. §§ 623(a), 631(a). Where, as here, the plaintiff seeks to prove his or her case through circumstantial evidence rather than direct evidence, the three-stage shifting burdens of proof developed for

employment discrimination cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *See Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009) (applying the *McDonnell Douglas* burden-shifting framework to ADEA claims).

In the first part of the analysis, a plaintiff must establish a prima facie case of discrimination which requires him to demonstrate: (1) that he was a member of the protected age class; (2) that he was qualified to hold the position; (3) that he suffered an adverse employment decision; and (4) that he was replaced by a significantly younger individual or that younger employees received comparatively more favorable treatment to create an inference of age discrimination. *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir. 1995); *see also Fallon v. Meissner*, 66 F. App'x 348, 351 n.4 (3d Cir. 2003) ("Perhaps most commonly, this element is shown by establishing that a younger employee replaced a plaintiff who had been terminated, or received a position the plaintiff had been denied. But other comparisons may be sufficient, depending on the context, such as a showing that younger employees were not laid off in the course of a reduction in force, or were not transferred."); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) ("[W]e have never held that the fourth element of the prima facie case should be relaxed only when there is a reduction in force."); *Johnson v. Delaware Cnty. Juvenile Det. Ctr.*, CIV.A. 11-1166, 2012 WL 895507, at *6 (E.D. Pa. Mar. 16, 2012) ("Our Court of Appeals recently reiterated this principle in the ADEA context, noting that 'the requirements of the prima facie case are flexible' and must be evaluated in light of the particular circumstances of the case before the court. This applies with particular force to the fourth element of the prima facie case of discrimination.'") (quoting *Kuzdrowski v. Nicholson*, 314 F. App'x 410, 413 (3d Cir. 2008)). An ADEA plaintiff does not, however, need to show that he was replaced by a person outside the protected class. *O'Connor v. Consol. Coin Caterers Corp.*,

517 U.S. 308, 312 (1996).

If the plaintiff establishes all four elements, the burden of production then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable employment decision. *Smith* v, 589 F.3d at 689-90; *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Once the employer "articulates such a reason, the burden of production returns to the plaintiff to show that the employer's proffered rationale was merely a pretext for age discrimination." *Id.* The burden of persuasion, "including the burden of proving 'but for' causation or causation in fact," remains with the plaintiff at all times throughout this exercise. *Smith* v, 589 F.3d at 690.

Moreover, the Supreme Court of the United States has held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Gross v. FBL Financial Services*, 557 U.S. 167, 129 (2009). Thus, in order to demonstrate pretext, it is incumbent upon the plaintiff in an ADEA case to demonstrate that age was a determinative factor or "the 'but-for' cause of the employer's adverse decision;" it is not sufficient to simply show that age was "a motivating factor." *Gross*, 557 U.S. at 176. *See also Smith*, 589 F.3d at 691 (holding that "the but-for causation standard required by *Gross* does not conflict with our continued application of the *McDonnell Douglas* paradigm in age discrimination cases.").

Here, the parties dispute the fourth element of a prima facie case: that he was replaced by a significantly younger individual or that younger employees received comparatively more favorable treatment to create an inference of age discrimination. The Court will address both formulations of this element.

### a. Replacement by a significantly younger individual

Knox cannot show that he was replaced by a significantly younger individual to create an inference of age discrimination.  When Fifth Third eliminated Knox's position, he was informed that Overcast would assume his responsibilities.  Overcast is approximately three years older than Knox.  Although Knox attempts to create an issue of material fact by claiming that Overcast was an "interim replacement" until September 2011 when Booth (eight years Knox's junior) assumed his responsibilities, nothing in the record reasonably supports that assertion.  Overcast left Fifth Third because he retired, and the time lapse separating Knox's reassignment and the start of Booth's tenure at Fifth Third renders the events too attenuated to reasonably support an inference of age discrimination.  Therefore, Knox cannot establish a prima facie case by relying on this aspect of the fourth element.

### b. More Favorable Treatment

Knox relies on the promotions of others as the basis for his claim that younger employees received comparatively more favorable treatment.  As Knox testified at his deposition:

> Q.  And who do you think discriminated against you?
> A.  Fifth Third Bank.
> Q.  Who specifically?
> A.  Senior managers that were in charge of the division that was the umbrella on top of the mortgage company.
> Q.  Who was that?
> A.  I'm not sure.
> Q.  Can you identify anyone specifically that you think discriminated against you?
> A.  No.
> Q.  Can you give us any basis for your belief?  What's the basis for your belief?
> A.  Well, when my position was eliminated at the end of 2009 there were three other gentlemen [*i.e.*, Lane, Garrity, and Smith] that were promoted into positions that all less experience than me.

Pl.'s Dep. at 68:3-20, ECF No. 37-3 at 10.  Knox now seeks to rewrite his deposition testimony, theorizing that his termination was "part of a concerted effort by Mr. Lewis to divest himself of

older, more experienced direct reports and replace them with younger individuals." Pl.'s Br. in Opp'n, ECF No. 42 at 21. This attempt, presumably aimed at avoiding summary judgment, cannot withstand scrutiny. *See, e.g. Reinert v. LSI Corp.*, 09-CV-3097, 2010 WL 2730756, at *9 n.17 (E.D. Pa. July 9, 2010) ("Plaintiff cannot effectively oppose a motion for summary judgment by contradicting her own deposition testimony without explanation."); *see also Pressley v. Beard*, 266 F. App'x 216, 218 (3d Cir. 2008) ("The District Court properly disregarded Pressley's attempts to contradict his deposition in his opposition to the summary judgment motion.").

Nevertheless, Knox cannot establish a prima facie case based on the 2009 and 2011 promotions of other employees to positions to which he never applied.[8] As Knox claims, Lane and Garrity received more favorable treatment because he was more qualified for their position.[9] The basis for this claim rests on Knox's own opinions that his work performance, experience, and qualifications were superior to those of others. Knox's opinions, without more, are an insufficient means to overcome summary judgment on this claim. *See, e.g.*, *Utley v. MCI, Inc.*, CIV.A.3:05-CV-0046-K, 2008 WL 836419, at *21 (N.D. Tex. Mar. 24, 2008), *aff'd*, 320 F. App'x 250 (5th Cir. 2009) ("[Plaintiff's] mere subjective belief that he was 'clearly better qualified' than his fellow employees is not sufficient to raise a fact issue as to whether he was discriminated against based on his age."); *see also Mynatt v. Lockheed Martin Energy Sys., Inc.*,

---

8. The only indication in the record that Knox ever expressed interest in Lane, Garrity, and Smith's positions was a conversation he had with Wilson (a Human Relations representative) when he expressed his interested in any open position which would have been a good match for his qualifications and skill set. Nowhere does Knox assert an independent claim of discriminatory hiring. *C.f. Lula v. Network Appliance, Inc.*, 245 F. App'x 149, 151-53 (3d Cir. 2007) ("Although the failure to formally apply for a job will not bar a plaintiff from establish a prima facie case for discriminatory hiring, the plaintiff must show that she made every reasonable effort to convey her interest in the job to her employer, was deterred from applying by the employer's discriminatory practices and would have applied for the position but for those practices, or had a genuine and real interest in the position but reasonably believed that a formal application would be futile.") (citations omitted).

9. At his deposition, Knox conceded that he knew little, if anything, about the work history, educational background or compensation levels of any of those individuals. *See* Pl.'s Dep. at 70:3-25-72:1-6, ECF No. 44-1 at 20. Knox now compares their respective qualifications after an apparent review of their depositions.

271 F. App'x 470, 477 (6th Cir. 2008) ("A plaintiff's contention that he was better qualified than the workers who were retained is insufficient to establish a prima facie case."). Therefore, the Court will grant Fifth Third's motion as it relates to his reassignment.

**B.  Termination**

Fifth Third likewise argues that Knox cannot make out this showing as it relates to his separation from the bank in March 2011. Alternatively, Fifth Third contends that Knox's employment ended for a legitimate, non-discriminatory reason.

Knox again submits that he has established the fourth prong by showing that he was treated less favorably than younger persons. In support, Knox highlights changes to Lewis' reporting structure over eighteen months. Further, Knox contends that the PIP was pretextual and that he never intended to leave Fifth Third—a suggestion which he calls "absolutely ridiculous" and "idiotic." *See* Pl.'s Br. in Opp'n, ECF No. 42 at 20.

**1.  Prima Facie Case**

**a.  Replacement by a significantly younger individual**

The Court of Appeals for the Third Circuit has not adopted a bright-line rule as to what constitutes a "sufficiently younger" employee, but it has provided some guidance. *See Steward v. Sears Roebuck & Co.*, 231 F. App'x. 201, 209 (3d Cir. 2007); *see also Barber v. CSX Distribution Servs.*, 68 F.3d 694, 699 (3d Cir. 1995) ("There is no magical formula to measure a particular age gap and determine if it is sufficiently wide to give rise to an inference of discrimination, however, case law assists our inquiry."). For example, in *Narin v. Lower Merion School District*, our court of appeals observed that the difference in age between a fifty-six-year-old employee and another who was forty-nine-years-old was not sufficient enough to allow an inference of discrimination. 206 F.3d 323, 333 n.9 (3d Cir. 2000). More recently, in *Showalter*

*v. University of Pittsburgh Medical Center*, it held that an eight year age differential was sufficient to satisfy the fourth element of a prima facie case. 190 F.3d 231, 236 (3d Cir. 2005).

District courts in the Third Circuit have weighed in similarly on this issue. *See Fitzpatrick v. Nat'l Mobile Television*, 364 F. Supp. 2d 483, 491 (M.D. Pa. 2005) ("This four-year age difference is insufficient to raise an inference of discriminatory action."); *Lloyd v. City of Bethlehem*, CIV.A. 02-CV-00830, 2004 WL 540452, at *6 (E.D. Pa. Mar. 3, 2004) ("The caselaw in this Circuit consistently holds that an age gap of less than five years is, as a matter of law, insufficient to establish fourth element of the prima facie test."); *Gutknecht v. SmithKline Beecham Clinical Labs., Inc.*, 950 F. Supp. 667, 672 (E.D. Pa. 1996) ( "Although no uniform rule exists, it is generally accepted that when the difference in age between the fired employee and his or her replacement is fewer than five or six years, the replacement is not considered sufficiently younger, and thus no prima facie case is made"). The Court finds these cases persuasive.

Here, Knox was replaced by Costa who is approximately four-years younger. The Court finds this age difference insufficient to raise an inference of discriminatory action, and therefore, Costa is not a "significantly younger individual" for purposes of the ADEA. Accordingly, Knox cannot satisfy the fourth prong on this basis.

### b. More Favorable Treatment

Aside from relying on the promotion of others, Knox also points to changes in Lewis' reporting structure over eighteen months as the basis for his claim that younger employees received comparatively more favorable treatment. Knox claims that this "evidence" suggests that Lewis's goal was to eliminate his oldest and most senior direct reports.

As a threshold matter, Knox relies on a patchwork of speculation and conjecture for this

claim. Knox has not provided admissible evidence to confirm that the ages of the direct reports are accurate, but instead approximates their ages based on his recollection for some and with the aid of questionable internet sources for others. Knox also has not provided any evidence describing the circumstances by which each individual ceased reporting to Lewis. Thus, based on the dearth of evidence to support his theory, Knox cannot meet the fourth element of an ADEA claim.

## 2. Legitimate Non-Discriminatory Reason & Pretext

For the sake of completeness, the Court notes that even if Knox had established a prima facie case, Fifth Third has identified a legitimate, non-discriminatory reason for terminating his employment. That is, Fifth Third has provided sufficient evidence to rebut any (assumed) presumption of age discrimination by demonstrating that Knox was notified of his shortcomings in e-mails from Overcast, given an opportunity to improve via the PIP, resisted the PIP to which he initially agreed, and sought a severance from Fifth Third on at least two occasions. After Knox represented that severance was the only option, Fifth Third offered him what he requested and ended his employment. To be sure, the record evidence shows in no uncertain terms that Knox demanded a severance in his letter to Pinckney as the only option, despite his current protestations to the contrary. Therefore, the Court finds that Defendant has met its "relatively light" burden by "introducing evidence, which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763.

At this point, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination. To discredit the employer's proffered reason, "the plaintiff cannot simply show that the employer's decision was wrong or

mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. Rather, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

Knox puts forth no evidence from which a reasonable factfinder could conclude that Fifth Third's stated reasons for his termination were pretextual. In an attempt to establish pretext, Knox suggests that the reassignment was a complete surprise, that his performance was excellent, that Overcast did not have the required skills, that his new position was a sham, that the PIP was unreasonable, that Fifth Third instituted all of his recommendations after his termination, and that the "claim that [he] wanted to quit his job is ridiculous." These suggestions are either unsupported in or contradicted by the record, speculative, or business decisions made by his employer that the Court will not second guess in the absence of any evidence of impermissible motives. *C.f. Robinson v. Matthews Int'l Corp.*, 368 Fed. App'x 301, 305-06 (3d Cir. 2010) (hiring someone with less experience and a lower level of education is not necessarily evidence of pretext and does not show discriminatory animus); *Gottschall v. Reading Eagle Co.*, CIV.A. 11-5361, 2013 WL 961266, at *6 (E.D. Pa. Mar. 12, 2013) ("[Plaintiff's] assertions about the accuracy of the evaluations also do not support a finding of pretext. Unfounded personal beliefs and conjecture about another employee's qualifications are legally insufficient to support a finding of pretext, and even a bad or inaccurate reason for termination is not a violation of the ADEA unless it is discriminatory."); *Spangler v. Moderne Glass Co., Inc.*, C.A. 6-1394, 2008 WL 919693, at *9 (W.D. Pa. Apr. 3, 2008) ("[Plaintiff's] subjective opinions about her

qualifications are insufficient to overcome summary judgment. Whether a court thinks that an employer misjudged a plaintiff's qualifications does not, in itself, make the employer's legitimate reasons unworthy of belief."). Accordingly, Knox cannot establish pretext even when the Court assumes he established a prima facie case of age discrimination.

## IV.   Conclusion

For the reasons hereinabove stated, the Court will deny the motion to strike and grant the motion for summary judgment. An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHRISTOPHER KNOX, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **2:12-cv-539** |
| v. | ) |
| | ) |
| FIFTH THIRD BANCORP, | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

AND NOW, this 3rd day of February, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION FOR SUMMARY JUDGMENT (ECF No. 34) filed by Defendant Fifth Third Bancorp is **GRANTED**; and that the MOTION TO STRIKE (ECF No. 46) filed by Defendant is **DENIED**. Judgment will be entered in favor of Fifth Third Bancorp and against Plaintiff Christopher Knox. The clerk shall thereafter docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc: **Adam K. Hobaugh, Esquire**
Email: adam.hobaugh@murtagh-cahill.net
**Joel S. Sansone, Esquire**
Email: joelsansone03@msn.com

**David K. Montgomery, Esquire**
Email: david.montgomery@jacksonlewis.com
**Melissa L. Evans, Esquire**
Email: melissa.evans@jacksonlewis.com